# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**ELIZABETH L. PERRIS**
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1536

DIANE K. BRIDGE, LAW CLERK
BETHANY COLEMAN-FIRE, LAW CLERK

**VIA ELECTRONIC NOTICE**

December 2, 2011

CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON
DEC - 2 2011
LODGED_____REC'D_____
PAID_____DOCKETED_____

Brian D. Turner
Turner Uhlemann PC
1631 NE Broadway #120
Portland, OR 97232

Paul J. Garrick
Staff Attorney
Fred Long, Trustee
P.O. Box 467
Eugene, OR 97440

      Re:    In re Jeffery L. Saleen and Kara L. Walls, Case No. 11-61957-elp13
             Chapter 13 Plan

Dear Counsel:

      This case raises the issue of whether Debtors, whose income is above the applicable median income, have positive projected disposable income ("PDI"). As explained fully in In re Reed, 454 B.R. 790, 803 (Bankr. D. Or. 2011), resolution of this issue will determine whether Debtors' applicable commitment period for their chapter 13[1] plan payments must be five years rather than the three years proposed in their plan. After considering the evidence from the October 21, 2011, hearing and the post-hearing briefs on the issue filed by the parties, I conclude that Debtors have positive PDI.

## Analytical Framework

      Analysis of PDI begins with Official Form B22C, on which Debtors determine their "disposable income." Line items thereon are presumptively correct to determine "<u>projected</u> disposable income." Reed, 454 B.R. at 796-97. The numbers may, however, be adjusted up or down to reflect known or virtually certain changes. Id. (citing Hamilton v. Lanning, 130 S. Ct. 2464 (2010)). To rebut the presumption as to income, an objector has the initial burden to "present evidence that the amounts used in the form [B22C] do not adequately predict the debtor's disposable income into the future." Id. at 796. When Form B22C differs from Schedules I and J, "[t]here must be evidence that the differences reflect predictable known or

---

[1]Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq.

virtually certain changes." Id. at 797. If the objector meets his burden, "debtors as proponents of the plan have the burden to show that the plan complies with all the requirements for confirmation. Id. at 796.

Reed also recognized that Form B22C's line items may be adjusted when an item is simply inaccurately computed. Id. at 799.

The evidence at the October hearing centered on several of Form B22C's line items.[2] I discuss each below beginning with agreed, and then moving to disputed, items.

### Agreed Line Item Adjustments

Line 8: Unemployment Compensation:

Line 8 lists $847.17/month as Mrs. Walls's unemployment compensation. The parties concede she is no longer receiving this compensation and Debtors have agreed to eliminate this item.

Line 9.a: Other Sources of Income:

Line 9.a lists $116.02/month as Mrs. Walls's BOLI settlement proceeds. Again, the parties concede she is no longer receiving these proceeds and have agreed to eliminate that amount from the calculation.

Line 26: Housing Expense Adjustment:

Line 26 lists $1,115/month as Debtors' housing expense. Post-petition, Debtors separated and Mrs. Walls now incurs a $510/month housing expense of her own. The Trustee has agreed to this additional expense.

Line 31: Other Necessary Deductions Required by Employment:

Line 31 lists $110.00/month as other necessary deductions required by employment. The Trustee agrees this figure may be increased to $119.17/month, thus increasing Debtors' monthly expenses by $9.17.

---

[2]Debtors submitted Exhibit #1, which is a draft amended Form B22C that they used for illustrative purposes. The line references in this letter are to Debtors' filed Form B22C (Exhibit C), rather than to their draft amended Form B22C (Exhibit #1).

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 3

Line 49: Priority Claims:

The parties stipulated that the payments for pre-petition priority taxes on Line 49 should be adjusted from $76.88/month to $10.60/month, resulting in a reduction of $66.28 in expenses.

**Disputed Line Items**

Line 28: Vehicle Expense:

Debtors own three vehicles, two of which are owned free and clear of liens. One, a 1998 Dodge Ram pickup, is secured to Wells Fargo Bank (WF). WF filed a proof of claim for $3,244.74. According to the retail installment contract attached to the proof of claim, the vehicle was purchased and financed in April 2009 and is thus a "910" claim. The contract provided for a 19.99% APR with payments of $296/month for 36 months.[3] Line 47.a amortizes the remaining contractual payments divided by 60 at $80.09/month. The Trustee does not take issue with this figure. Line 28.a lists the $496 vehicle ownership expense, from which the above $80.09 is deducted on Line 28.b (to avoid double counting), resulting in a $415.91 "net" on Line 28.

The Trustee argues that the $496 is a cap and that Debtors should only be allowed the standard expense amount or the amount they actually spend, whichever is less.

Although some authority from other jurisdictions and the IRS's internal Collection Financial Standards ("guidelines") supports the Trustee's position, this issue has been resolved adversely to the Trustee in this district. In In re Cummings, 2007 WL 6362250 (Bankr. D. Or. March 2, 2007), Judge Brown held that the debtors were entitled to take the full ownership expense, even if their actual expense was less. Ransom v. FIA Card Services, 131 S. Ct. 716 (2011), does not abrogate Cummings. Ransom held that the guidelines had not been incorporated or otherwise imported into § 707(b). Id. at 726. Rather, the guidelines were merely an interpretive tool that could be consulted as a persuasive, but not controlling, source in interpreting the National and Local Standards. Id. at 726 n.7. The Court made clear that the guidelines had no effect if they were at odds with the statute's language. Id. at 726. Under Cummings, resort to the guidelines would be at odds with the statutory language. In Cummings, Judge Brown held that the statute's language, particularly in its differentiation between standard amounts for some expenses and "actual" amounts for others, clearly allowed the full standard deduction. Further, there is nothing ambiguous about the dollar amount of the ownership standard under § 707(b)(2)(A)(2)(ii).

The Trustee also cites Yarnall v. Martinez (In re Martinez), 418 B.R. 347 (9th Cir. BAP 2009) and American Express Bank v. Smith (In re Smith) 418 B.R. 359 (9th Cir. BAP 2009). In

---

[3]The plan proposes to pay WF's claim in full through ¶ 2(b)(1) at 4.5% interest with payments of $100/month until attorney's fees are paid and then $275/month thereafter.

these decisions, the BAP held that "phantom" expenses such as contractual payments on wholly unsecured liens and payments on claims where the collateral is being surrendered cannot be "reasonably necessary" under § 1325(b)(2), and thus recourse need not be made to the "amount" of the expense under § 1325(b)(3) and § 707(b)(2)'s means test. The Trustee argues that the same rationale applies here as to the excess standard over actual expense of owning a car. I reject this argument. Even assuming that the BAP's rationale survived Ransom, here, unlike in Martinez and Smith, Debtors' vehicle ownership expense is not wholly fictional (i.e. they are making a car payment). Under Ransom, they are allowed a deduction, which Cummings permits as the full $496 standard expense.

Based on the above, I will not adjust Line 28.

Line 39.a: Health Insurance:

Line 39.a lists a $567.74 health insurance expense, which was Debtors' combined outlay ($219.27 for Mr. Saleen and $348.47 for Mrs. Walls) when they filed their chapter 13 petition. Post-petition, Mr. Saleen cancelled his insurance when Mrs. Walls picked up insurance for the whole family through her new employer, with premiums of $142.24/month. The Trustee argues that Line 39.a should be adjusted to this amount.

Debtors have now separated. They argue that it is likely Mr. Saleen will have to resume his own insurance and therefore Line 39.a should be adjusted down only to $361.51, which is the $142.24 Mrs. Walls is currently paying plus the $219.27 Mr. Saleen was paying at filing and that Debtors argue he will likely need to resume paying.

By showing Mr. Saleen's health insurance cancellation and Mrs. Walls's reduced premium through her new employer, the Trustee has rebutted the presumption that Line 39.a accurately reflects Debtors' health insurance expense going forward. Mr. Saleen testified that he anticipates having to resume insuring himself and his children but did not say when. Mrs. Walls testified that she would definitely insure herself over the next 60 months, but did not know if she would continue to insure Mr. Saleen's children over that time. I believe this evidence is insufficient to show that it is virtually certain Mr. Saleen will resume paying his own health insurance. Further, there is no evidence as to the amount Mrs. Walls would pay to insure just herself, as opposed to the whole family. Finally, there was no evidence as to whether or not Debtors would soon divorce, in which case Mr. Saleen would be forced to obtain his own insurance. Therefore, I will adjust Line 39.a to $142.24, which amounts to a $425.50 reduction in expenses.

Line 2: Gross wages and Commissions:

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 5

<u>Mr. Saleen</u>:

Line 2 lists Mr. Saleen's gross wages at $4,709.01 per month. The Trustee argues that this figure should be adjusted, citing <u>Reed</u>, 454 B.R. at 797, for the proposition that "seasonality that predictably results in income differences at different times of the year" can support a <u>Lanning</u> change.

Mr. Saleen is a truck driver for an excavating company where he has been employed for approximately six and a half years.[4] Line 2 represents his average gross monthly income between October 1, 2010 and March 31, 2011, because the Form B22C provides a snapshot of a debtor's "current monthly income" ("CMI"), which is an average for the six calendar months preceding the case. § 101(10A). Exhibit E is a packet of pay advices for the period March 18, 2011, through September 16, 2011, with year-to-date figures. Based on this data, the Trustee extrapolates Mr. Saleen's income for October 1, 2010, through September 30, 2011, at approximately $60,613, or $5,051/month. <u>See</u> Trustee's Post-Hearing Memorandum at pp. 8-9 [doc. 34]. The pay advices show by quarter:

        4th Q 2010 - $15,991 (included in CMI)
        1st Q 2011 - $12,263 (included in CMI)
        2nd Q 2011 - $15,263
        3rd Q 2011 - $17,096

Debtors argue that these figures do not show a known or virtually certain change. They point to the fact that Mr. Saleen's gross income fell by more than $20,000 between 2009 and 2010.

I find that the Trustee has rebutted the presumption that the figure on the Form B22C is correct by adducing evidence that Mr. Saleen's spring/summer income is a change "from the amounts used in the Form B22C [fall/winter income] that [is] known or virtually certain." <u>Reed</u>, 454 B.R. at 798. The Trustee's income data confirms Mr. Saleen's testimony that he will earn less in the next six months and that, although his rate of pay will stay the same, he works more in summer than winter.

The question is whether evidence of only one year's past income (October 1, 2010 - September 30, 2011) is enough to predict continued similar income. I conclude that it is, particularly given that Mr. Saleen testified that he did not know where the figure for the Amended Schedule I's projected income of $5,116/month came from. Even assuming he forgot, I believe it is no accident that it corroborates the Trustee's $5,051/month figure. Other than the

---

[4]Mr. Saleen was questioned as to how he arrived at the gross income figures on Schedule I ($4,376.15) and Amended Schedule I ($5,116.02). As to the former, he testified it was based on his gross 2010 income divided by 12. As to the latter, he testified he did not recall.

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 6

historical gross income figures in response to Question #1 on the Statement of Financial Affairs, Mr. Saleen has adduced no countervailing evidence indicating that his hours will be cut in the future.

Contrary to Debtors' argument, this case can be distinguished from Reed. There, the husband's income fluctuated throughout the year, id. at 798, and there was no evidence that the discrepancy between the debtors' Second Amended Schedule I and Form B22C was due to seasonality. Id. Here, there is such evidence. Therefore, I will adjust Line 2 to $5,051, resulting in an income increase of $341.99.

Mrs. Walls:

Line 2 lists income for Mrs. Walls of $1,078.88/month in wages, bonuses, commissions, etc. Debtors concede that with her new employment as a sales representative for United Rentals, the Trustee has met his burden of showing a Lanning change, and that "it falls on Debtors to establish her [Mrs. Walls's] projected income." Debtors' Post-Hearing Brief at p. 7:23-25 [doc. #35]. They argue that Line 2 should be adjusted to $3,882.39, which is the same figure listed in Amended Schedule I. The Trustee argues that Line 2 should be adjusted to $4,250.00.

The testimony established that Mrs. Walls began working for United Rentals on March 28, 2011. She earns a base salary of $2,000/month plus commissions of 1-2% of gross rental sales. During the first four months on the job she received $2,000/month as a guaranteed commission. She testified that her predecessor with more sales experience averaged $40,000/annum gross income over the last three years. She further testified that her income was seasonal, as she leased out "dirt" equipment that cannot operate in the mud. She testified that, although last year her company had several multi-million dollar federally funded hospital projects, this year no jobs of that scale were in the pipeline.

As with Mr. Saleen's income, the Trustee has summarized the figures from Mrs. Walls's pay advices (compiled as Exhibit F) dating from the end of May to the end of September 2011. Then, based on Mrs. Walls's salary and guaranteed commission for the March 28 - May 26 period before the advices began, he extrapolates her average monthly salary at $4,371.30 for the first six full months on the job (April 1, 2011 - September 30, 2011). This increases to an average of $4,516.71/month for the first seven months, based on her testimony that her October commission check (for September sales) would be about the same as September's (for August sales). And based on her testimony regarding November's commission (based on October sales of approximately $80,000), her average monthly income for the first eight months would be $4,444.13. This figure would increase by approximately $80 if estimated commissions for the last week in October were added. Then, based on Mrs. Walls's testimony that her commissions would drop to half of October's beginning in November (to be paid in December) for the next four months, the Trustee estimates that her average monthly salary for her first year on the job is $4,194 (or $4,310 using a higher October average based on estimated commissions earned

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 7

during the last week of that month). The mid-point between these two figures ($4,194 and $4,310) is approximately $4,250.

The Trustee notes that, even if Mrs. Walls earns no commissions in the next four months, she will still exceed the $40,000 gross she testified was average for her predecessor.

Because Mrs. Walls's base salary of $2,000.00/month is constant, the dispute revolves around her projected commission income. Despite his detailed analysis, the Trustee's evidence is not enough to increase Debtors' $1,882.39 figure ($3,882.39 - $2,000.00) for monthly commissions. First, the Trustee's figures include four months of guaranteed $2,000 commissions that no longer exist. Thus, there were only three months of actual commissions at the time of the hearing. This is not a very large sample from which to project, particularly given the seasonal aspects of the business. Second, the testimony was uncontroverted that Mrs. Walls's past and anticipated (already earned) commissions were based on large federal jobs, which were no longer forthcoming. Rather, Mrs. Walls estimated her commissions for the next six to twelve months would be halved based on her company's projections, which were based on bids. I find Mrs. Walls's testimony to be credible and therefore conclude that Debtors have established by a preponderance of the evidence that the $3,882.39 figure is accurate. This increases Mrs. Walls's Line 2 income by $2,803.51 ($3,882.39 - $1,078.88).

Line 30: Taxes:

Line 30 lists $1,747.62 as Debtors' actual taxes. This is the same figure that appears on the original Schedule I. Debtors argue that Line 30 should be increased to $1,858.59, because Mrs. Walls is now earning more and hence her tax liability will be greater. Their figure is based on Mr. Saleen's monthly withholdings of $907.62 as set forth on original Schedule I plus Mrs. Walls's monthly withholdings of $950.97 set forth on Amended Schedule I.

The Trustee argues that Line 30 should be reduced to $1,728.76 based on Debtors' $1,858.59 figure minus $129.83, which is their net 2010 tax refunds ($1,933 federal refund - $375 Oregon tax liability = $1,558) divided by twelve.

According to their 2010 return (Exhibit D), Debtors' federal tax liability was only $5,481 on an adjusted gross income of $94,427. Examining their pay advices, through September 16, 2011, Mr. Saleen had withheld $4,136.41 in federal tax on a gross of $43,307 and through September 23, 2011, Mrs. Walls had withheld $3,425.45 on a gross of $25,969, for a total of $7,561.86 in federal tax withheld on a total gross income of $69,276. This, on approximately $25,000 less income, exceeds their total federal tax liability for all of 2010. The Trustee thus contends that Debtors are overwithholding, and that Line 30 does not accurately estimate their tax liability.

I conclude that Line 30 should not be adjusted in determining PDI. Computing tax liability is an inexact science at best. Debtors have not met their burden of showing either an incorrect initial computation or a Lanning change that requires an upward adjustment. Debtors' suggested $1,858.59/month for taxes equals $22,303 in annual tax liability. In 2010, their total liability was $11,889; thus Debtors project a $10,414 income tax increase. Using the income figures as discussed in the prior section, Debtors' 2011 gross income will exceed 2010's by approximately $4,400 and their 2012 and subsequent years' income will exceed 2010's by approximately $13,000.[5] That amount of increased income would not normally equate to a more than $10,000 increase in tax liability. Such an increase is possible if Debtors divorce or file separate returns or their credits or deductions change. However, they have not provided evidence that such a dramatic increase in tax liability is certain or virtually certain. On the other hand, the Trustee has not provided competent evidence to substantiate his $1,728.76 figure, given Debtors' changed income.

In essence, I agree with Debtors that, to deviate from Line 30, a party would need to provide a mock return or other competent evidence based on known or virtually certain changes. Neither party has done so.

Debtors introduced a side issue by arguing that, if Line 30 is adjusted to take into account projected future tax refunds, then the boilerplate in Plan ¶ 1 requiring payment of tax refunds should be deleted. Because Line 30 will not be adjusted, I will not address all of Debtors' arguments in this regard. It is worth noting, however, that Line 30 does not implicate an adjustment to withholdings as Debtors suggest. Debtors characterize the Trustee's position as forcing them to "project future refunds into the plan's base," by requiring them to decrease their tax withholdings in order to increase their monthly plan payments. This is inaccurate. Rather, Line 30 demands the best estimate of actual taxes going forward, not what is being withheld, which may or may not approximate a debtor's eventual tax liability. In re Balcerowski, 353 B.R. 581 (Bankr. E.D. Wis. 2006); accord In re Mullen, 369 B.R. 25, 35 (Bankr. D. Or. 2007). This is important to do, because actual taxes are part of the PDI equation and PDI not only establishes the amount payable to unsecured creditors but also the plan's length. If, as it turns out, Debtors' actual tax liability is less than Line 30 (and Debtors have withheld Line 30's amount or more from their wages), they would get a refund, which Judge Dunn has held is appropriate to pay into the plan as projected disposable income. Id. This is not double-dipping; it is simply recognizing the difficulties of predicting tax liability and denying Debtors the benefit of an overestimated expense. Id. Further, Mullen holds that dedication of future refunds is not required if debtors provide evidence that they were not and would not be overwithholding. Id. Here, Debtors have

---

[5] If we take each Debtor's projected income as discussed above (Mr. Saleen - $5,051/month ($60,612 for 2011); Mrs. Walls - $3,882.39/month times 9 months + ($1,078.88 x 3 months) ($38,178.15 for 2011)), they will together gross approximately $98,790 in 2011. In subsequent years, assuming current earnings, they will gross together more than $107,200 ($60,612 for Mr. Saleen and $46,588.68 ($3,882.39 x 12) for Mrs. Walls).

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 9

not provided such evidence. In fact they have done just the opposite. Their Amended Schedule I lists $1,097.94 withholding for Mr. Saleen and $950.97 for Mrs. Walls, for a total of $2,048.91/month as compared to their "actual tax" figure of $1,747.62 on Line 30.

Based on the above, I will not adjust Line 30, nor will I eliminate the requirement that Debtors pay in their net post-petition tax refunds to the Trustee.

### Conclusion

Netting out all of the above additions and subtractions yields a positive PDI of $356.99 per month, calculated as follows:

| | | |
|---|---|---|
| Disposable income per Form B22C (Exh. C, line 59) | | $ (1,797.93) |
| Additions (summarized below): | | 3,637.28 |
|     Priority claim reduction | 66.28 | |
|     Health insurance reduction | 425.50 | |
|     Mr. Saleen's increased income | 341.99 | |
|     Mrs. Walls's increased income | 2,803.51 | |
| Subtractions (summarized below): | | (1,482.36) |
|     Mrs. Walls's unemployment compensation | 847.17 | |
|     Mrs. Walls's BOLI settlement proceeds | 116.02 | |
|     Mrs. Walls's housing expense | 510.00 | |
|     Increase in other necessary deductions required by employment | 9.17 | |
| Projected Disposable Income | | $ 356.99 |

Brian D. Turner
Paul J. Garrick
December 2, 2011
Page 10

      Debtors' applicable commitment period is 60 months. Confirmation of the present plan, which is a 36-month plan, is denied. Debtors shall be allowed 14 days to file a modified plan if the matter cannot be resolved before then through amendments to the plan via the confirmation order.

                                   Very truly yours,

                                   Elizabeth L. Perris
                                   Bankruptcy Judge